UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 7, 2018

-------------------------------------------------------------- X

UNITED STATES OF AMERICA

-v-

EMIL SOSUNOV,

Defendant.

17-cr-0350 (KBF)

OPINION & ORDER

-------------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

On October 26, 2017, a criminal complaint was filed accusing Emil Sosunov of narcotics conspiracy under 21 U.S.C. § 846 and Magistrate Judge Ellis signed a warrant for his arrest. (ECF Nos. 1, 2.) The next day, Sosunov was arrested in the doorway of his apartment at or around 6:00 a.m. At the time of his arrest, officers entered his apartment to perform a protective sweep. During the sweep, they observed evidence that subsequently formed the factual support for a search warrant. The search warrant was executed later that same day. On December 14, 2017, Sosunov was indicted for conspiracy to distribute a controlled substance. Evidence supporting this charge was obtained during the execution of the search.

Before the Court is Sosunov's motion to suppress evidence obtained as a result of the execution of the search warrant. Defendant's principle argument is that various infirmities with the protective sweep and "plain view" evidence require that they be ignored and, that once ignored, the warrant is without sufficient factual support. In addition, he argues that: (1) the arrest warrant itself was not supported

by probable cause; and (2) that there are additional and separate bases to suppress all cellphone location and pen register information as well as evidence found through searches of the cellular telephones found in his apartment.

Because there were contested issues of fact—in particular, the circumstances surrounding where the defendant was physically arrested and whether a protective sweep was appropriate—the Court held an evidentiary hearing on April 3, 2018. At the conclusion of the hearing, the Court informed the parties that it intended to deny the motion and that a written decision would follow. This is that decision.

I.  FACTS[1]

A.  <u>Preliminary Investigation</u>[2]

The following facts are drawn from sworn statements in the Complaint as well as evidence adduced in connection with this motion. The Court's factual statements are based on what a preponderance of the evidence shows.

In September and October 2017, law enforcement was investigating Dr. Varuzhan Dovlatyan and his office manager, William Thomas, for narcotics conspiracy. (ECF No. 1, Compl. ¶ 6.) Without any physical examination, two undercover agents were able to obtain oxycodone prescriptions from Dovlatyan.

---

[1] The Court held a suppression hearing on April 3, 2018, at which it heard testimony from three of the officers involved in Sosunov's arrest and the protective sweep: Robert Hanratty, Bruce Turpin, and Dominick Jaworski. The defense did not call any witnesses. Hanratty and Turpin are special agents with the FBI assigned to the Eurasian organized crime squad. They have years of experience in identifying, investigating, and dismantling criminal organizations. They investigate crimes include murder-for-hire, fraud, extortion, illegal gambling, and narcotics trafficking. Jaworski has been a detective in the New York City Police Department since 2005, where he has been assigned to the Eastern European organized crime task force. The Court found all three officers very credible. Their testimony was consistent, not exaggerated, and credible.

[2] In deciding a suppression motion, the Court is entitled to rely on hearsay as well as uncontradicted sworn statements in complaints.

(Id.)  Dovlatyan simply accepted cash in exchange for the prescriptions.  (Id.)  When one of the agents asked where he could fill the prescriptions, Dovlatyan directed him to Thomas, his employee. (Id.)  The Complaint states Dovlatyan "instructed [the agent] that if [he] encountered [any] 'problems' to call Thomas."  (Id.)  Thomas referred the agents to his "connect": a pharmacy in Brooklyn which charged $360 to fulfill the prescription.  (Id.)  Thomas told an agent that he could "get [oxycodone prescriptions filled] all the time without no problem" there.[3]  (Id.)

During a review of prescription records provided by the New York State Bureau of Narcotics Enforcement ("BNE"), law enforcement discovered that over the preceding year or so, Dovlatyan had issued prescriptions to a number of Sosunov's co-defendants for hundreds (or, in some cases, over a thousand) oxycodone pills.  (Id. at ¶ 9.)  Fifteen of those prescriptions—issued between April 20, 2016 and June 13, 2017—prescribed a total of 2,250 oxycodone pills for two individuals with the last name "Sosunov"; the address indicated on the BNE report was the same address as that at which the defendant lives.  (Id. ¶¶ 14-15.)  All but one of those prescriptions were filled at the same pharmacy.[4]

At some point prior to October 17, 2017, Thomas began cooperating with law enforcement.  On or about October 17, 2017, at approximately 11:30 a.m., law

---

[3] Additionally, law enforcement learned from a cooperating witness ("CW-1") that one of Sosunov's co-conspirators had "approached CW-1 to propose an arrangement under which [the co-conspirator] would provide prescription pills for resale on the black market at a storefront operated by CW-1." (Id. at ¶ 7.)

[4] The Court draws the reasonable inference based on the evidence in the record that this is the same pharmacy Thomas referred to as his "connect."  In any case, this is not material to the Court's decision.

enforcement observed Thomas sitting in the driver's seat of a vehicle parked outside

Dovlatyan's office; Sosunov entered the vehicle and sat in the front passenger seat.

(Id. ¶ 11.)  Shortly thereafter, Dovlatyan allegedly approached the front passenger

window and Sosunov handed him "what appeared to be a large amount of currency."

(Id.)  The recording device picked up a conversation in which Sosunov and Thomas

discussed "several prescriptions, other identities to get oxy prescriptions, among a

couple of other drugs as well."  (Apr. 3, 2018 Hearing Tr. ("Tr.") at 5:22-6:10.)[5]

Sosunov then exited the car and departed the scene.  (Compl. ¶ 11.)  Agents then

observed him meet a female near a pharmacy—the Thomas "connect" pharmacy

that had previously filled fourteen of Sosunov's previous prescriptions.  (Id. ¶ 12.)

Sosunov waited outside while she entered.  (Id.)  Soon afterward, the female exited

and handed Sosunov a black plastic bag.  (Id.)  At approximately 2:30 p.m. that day,

Dovlatyan was arrested in a separate location; upon arrest, he was found in

possession of approximately $2,100 in U.S. currency.  (Id. ¶ 13.)

On October 26, 2017, Magistrate Judge Ellis signed a warrant for Sosunov's

arrest based on this information; on that same day, he also signed an order for

cellphone location information and pen register information.  (ECF No. 2, Arrest

Warrant; ECF No. 600-3, Warrant & Order.)  The affidavit in support of the

geolocation warrant application largely repeated the facts in the Complaint but also

noted that (1) Thomas had provided the Government with Sosunov's phone number

---

[5] For clarity's sake, the Court notes that this detail was not included in the affidavit supporting the
application for an arrest warrant.

(i.e., the target phone); (2) law enforcement believed Sosunov to be associated with multiple co-conspirators and that he "obtains oxycodone for resale through 'patients' whom Sosunov directs to fill prescriptions at those pharmacies"; and (3) law enforcement had thus far been "unsuccessful at conducting surveillance of SOSUNOV outside of the meeting on or about October 17, 2017 . . . . The requested information will, among other things, assist law enforcement in identifying SOSUNOV's location in advance of arrest, identifying which pharmacies SOSUNOV visits and has visited in connection with the conduct under investigation . . . ." (ECF No. 600-3, Agent Aff. in Supp. of Warrant & Order for Cellphone Location & Pen Register Information, at 10-11.)

B. The Arrest

On October 26, 2017, law enforcement prepared to execute the arrest warrant for Sosunov. They had information indicating that he co-habitated with a woman who, they believed, had been previously arrested for a drug offense.[6] (Tr. at 6:21-7:4, 10:12-14; see also GX 106, 106A, 106B.) Sosunov had previously been arrested for, inter alia, possession of dangerous weapons, drugs, and felony assault. (Tr. at 10:1-6; see also GX 106A.) At the evidentiary hearing, Agent Hanratty testified. He was calm and professional and displayed a clear recollection of the events. The Court found him very credible. Hanratty testified that the information relating to

---

[6] The NYPD provided the team with a criminal record for a woman named Gabriella Gendelman. (See GX 106B.) However, the document was attached to an email; the attachment itself had Daniella Gendelman's name on it. (Tr. at 9:7-11.) Agent Hanratty, the team leader, testified that at the time of the arrest, he believed the rap sheet pertained to Daniela Gendelman, who he believed was Sosunov's girlfriend (but is in fact his wife). (Id. at 10:18-11:1.) In any case, Hanratty had also reviewed BNE records that indicated Daniela Gendelman had fulfilled oxycodone prescriptions. (Id.)

prior drug activity and guns put the team on notice of a potential for danger and a co-habitant knowledgeable about the drug offense. (Tr. at 10:12-17.)

At 5:30 a.m. on October 27, 2018, the arrest team convened at Caesar's Bay, where Hanratty briefed them on the anticipated location of the arrest and provided an overview of the case; he also showed the team pictures of "the people we anticipated to come up against," including Sosunov and Daniella Gendelman. (Id. at 11:10-22.) They then moved to the target location, 2740 Cropsey Avenue, where two officers stayed outside; the rest went up to the Sosunov's apartment on the third floor, where they lined up in a "stack" outside his door. (Id. at 12:13-15, 46:4-6.)

The first officer in the stack, Detective Jaworski, also testified at the evidentiary hearing. He was professional, clear, and not prone to exaggeration. The Court found him to be credible and relies on his testimony. Jaworski testified that, as the officer was closest to the door, he knocked and yelled "Police." (Id. at 13:12-20; 15:4-16, 46:7-22; see also ECF No. 601, Def.'s Aff. ¶ 4.) This verbal "knock and announce" was not contradicted. The agents then heard "chatter" and the "sounds of multiple people, of conversations, somebody scruffling" from the interior of the apartment. (Tr. at 13:17-14:4; see also id. 46:20-47:4.) A period of approximately thirty seconds or so elapsed, during which the noises continued and the officers waited. Hanratty testified that, given the delay and the noises, he considered directing Agent Turpin to use the battering ram. (Id. at 13:21-14:12; see also id. 56:2-4.) Hanratty also testified that at that moment, he had multiple

6

"operational concerns": "That is the most dangerous part of our job, is when we execute the arrest. This could be a multiple thing. It could be (1) jumping out a window or trying to escape, (2) trying to get a weapon to defend themselves, (3) destroying evidence, or a multiple of things." (Id. at 14:16-20.) On a relatively recent prior occasion, during the same overall investigation, a suspect had in fact jumped out of a window and fled.

Eventually, however, Sosunov answered the door in his underwear; while he was standing in the doorway, Jaworski secured him. (Id. at 14:24-25, 68:19-20.) Jaworski testified credibly that Sosunov was positioned directly in the threshold of the doorway with his feet "[i]n the door frame," between the apartment and the hallway—he had not stepped into the hallway (i.e., one would not be able to shut the apartment door without hitting him). (Id. at 48:14-18; see also id. 16:2-20, 56:24-57:4.) Sosunov was handcuffed by Jaworski against the door frame in the doorway. (Id. at 49:11-12, 57:1-20, 71:1-5.) Jaworski did not search Sosunov (who, again, was wearing only underwear at the time). (Id. at 77:23-78:8.)

From the doorway, the officers could see a blonde female; based on the information provided to the officers prior to the execution of the warrant, they believed she was Daniella Gendelman. (Id. at 15:1-3.) The woman stood a short distance behind Sosunov and held a dog in her hands. (Id. at 34:19-24, 50:15-18, 58:16-21.) Agent Turpin instructed her to "face the wall and continue holding the dog and just to stay there." (Id. at 50:24-25.) The agents were able to see down a hallway from the front door but could not see the area to the right; in other words,

one could see down the hallway from the door but could not view the bulk of the living room or the apartment from that angle.  (Id. at 16:24-17:15; see also GX 101, 102MMM.)

As soon as Sosunov opened the door, Hanratty and others began a protective sweep, or a "cursory search to look for potential threats of other people in there that could do harm to the arrest team."  (Tr. at 18:3-4.)  When asked why he did not "just pull [Sosunov] out of the apartment, shut the door, and walk away," Hanratty responded:

> One, he was in his underwear.  We are not going to bring somebody to process in their underwear.  It is the middle of the fall.  I knew eventually we would have to get in there.  I also heard conversation in there, so I knew there was more than one person in there.  Three, there is a lot of dead space in there on that whole side of the living room, to make sure she is not reaching for a gun or reaching for anything for our safety in there.  It was a very tight hallway with a lot of bodies in there.  We . . . were in like a fatal funnel in that area.  My responsibility as the team leader is to ensure the safety of everybody involved.

(Tr. at 18:8-18; see also id. at 32:14-15 ("We are not going to bring somebody in their underwear to court that day, so we got him dressed."); id. at 35:12-19 ("They put hands on [Sosunov], and I entered because I saw somebody else in there.  I'm not going to allow somebody else—if I know somebody else is there, it is my duty as a team leader or as an officer to ensure that it is safe for everybody.  I don't know what that person is doing behind that door.  There is a whole living room in there.  I went in there to engage and do a protective sweep, in short.  Everything was clear.").)

Hanratty also testified that, "given the nature of the case and narcotics cases, like I said, I have had people jump out windows, there could be other dealers in there or users in there. Given the prior history and what I know about the case, I was not going to take any chances. . . . [O]n the same case three months prior I had a person who was charged with drug conspiracy jump out of a second floor window and the agents [outside the building] didn't catch him." (Id. at 36:20-37:5.)

Hanratty and other agents entered the apartment and swept the living room, the bathroom, the hallway that led to the kitchen and bedrooms, and the other rooms to "make sure there are no bodies hiding"; they did not look in any space in which they did not believe a person could hide. (Id. at 20:9-21:4; 72:19-21; see also id. 72:9-12 (testimony from Jaworski that "[i]n a security sweep we are looking for a human being who could have been hiding in one of the rooms or closets").) The agents testified that Gendelman "seemed angry and agitated" but did not try to stop the agents from entering; when Hanratty asked if anyone else was present, she said no. (Id. at 20:2-3, 42:6-13, 80:19-22.) The whole sweep took no more than three to five minutes. (Id. at 37:6-8.)

Hanratty observed a safe in a hallway closet during the sweep. (Id. at 20:16-17.) In the master bedroom, the agents also saw multiple phones next to the nightstand, in plain sight.[7] (Id. at 52:18-20.) In the kitchen area, they observed a door to a balcony. The door and surrounding windows had "pull-down shades that

---

[7] Hanratty and Turpin both testified that they knew Sosunov had "use[d] cell phones to conduct the pill scheme." (Id. at 21:14-23, 52:22-23.)

9

[the agents] couldn't see through," so Jaworski "opened the balcony door, and [he] checked if there was anyone hiding . . . ." (Id. at 72:24-73:3.) On his way back inside, he noticed "a stack of envelopes" directly to his right. (Id. at 73:23-25.)

As the agents assisted Sosunov in getting dressed, Jaworski asked Hanratty to come to the living room to inspect the stack of envelopes he had seen near the entrance to the balcony. (Id. at 23:2-7, 74:18-20; see also GX 105.) The envelopes had names, words indicating colors,[8] and amounts written on them; Hanratty testified that he considered this "plain view evidence." Hanratty testified credibly that, without picking the envelopes up, he was able to recognize names from BNE records he had previously reviewed relating to recipients of prescriptions for large quantities of oxycodone. (Tr. at 25:19-25, 26:14-19, 38:14-20, 53:10-15.) Following this observation, Hanratty testified that he picked up the envelopes and determined that it felt like they contained cash; he did not open them. Agent Turpin testified at the hearing. The Court also found him credible. He testified that he also observed the envelopes and that at least one of them was already open. (Id. at 39:8-40:22, 42:24-43:4, 59:23:60:10.) Another agent informed Hanratty that they had found prescription bottles for Sosunov and Gendelman sitting in plain view on a kitchen counter; the bottles indicated Dovlatyan as the prescribing physician (the doctor with whom Sosunov met on October 17, 2017, according to law enforcement, and

---

[8] In Hanratty's experience, colors such as "orange" were often code words for types of pills. (Id. at 30:1-19.)

who had previously provided Sosunov with about 2,500 oxycodone pills, according to BNE records). (Id. at 30:20-31:3, 53:22-54:11; see also GX 103G.)

Soon thereafter, Turpin left to secure a search warrant while Jaworski and others stayed in the apartment to conduct a "freeze," ensuring that "no objects [were] moved or disturbed" while the search warrant was obtained. (Tr. at 75:22-76:1.) Hanratty left with Sosunov for the FBI field office at 26 Federal Plaza in Manhattan; he was presented to a magistrate and released on bail later that day. (ECF No. 4.)

C. The Search Warrant

Turpin swore out an affidavit in support of a search warrant application. His affidavit described the apartment's location with particularity (i.e., it gave the address, described the outside door, and noted that the apartment is on the third floor). (ECF No. 600-2, Aff. in Supp. of App. for Search Warrant ("Turpin Aff.") ¶ 5.) The affidavit incorporated the complaint and described five pieces of evidence as having been observed in "plain view" during the arrest that morning:

> i. On the kitchen counter within the Subject Premises two prescriptions for oxycodone, each bearing the name of "Varuzhan Dovlatyn," the doctor and coconspirator described in the Complaint.
> ii. On the kitchen counter within the Subject Premises an unmarked prescription pill bottle with as-yet unidentified pills, located next to the two oxycodone prescriptions bearing Dovlatyn's name, as described above.
> iii. On a window ledge near a door leading to an exterior balcony, multiple envelopes appearing to contain United States currency with writings on the face of each envelope. The writing appears to provide a "ledger" and amounts either paid by or owed to various narcotics customers. For example, one envelope reads, in part, "UPL, Lasha . . . Zan, Joseph+ 60 orange 5,180 + 600 = 5,780." From my review of records provided by the New York State Bureau of Narcotics

11

Enforcement, I have learned, among other things, that Varuzhan Dovlatyn prescribed oxycodone to a patient using the name "Lasha Uplisashvili" (i.e., "UPL, Lasha") approximately eleven times between in or about July 2016 and June 2017. Furthermore, based on my training and experience, and my experience investigating the sale of prescription pills, in particular, I know that distributors of illicit controlled prescription pills frequently refer to such pills using a color code, rather than the chemical or trade name of particular drugs (e.g., "60 orange").

iv. A locked safe found in a hallway closet within the Subject Premises.

v. On two separate nightstands inside the Subject Premises, three separate cellular telephones (two Blackberry and one iPhone smartphones).

(Id. ¶ 6.) Notably, the warrant did not rely on—or even mention—an allegation that the agents felt or viewed cash inside the envelopes.

The search warrant was signed by Magistrate Judge Bulsara at 12:30 p.m. on October 27, 2017 and allowed agents to search for, inter alia, prescriptions and prescription pill containers, U.S. currency constituting proceeds of narcotics distribution, controlled substances, and cellular phones. (ECF No. 600-2 at 15.) The search was thereafter executed and such items were obtained from the premises.

 D. Procedural History of the Instant Motion

  On March 2, 2018, Sosunov moved to suppress observations made during his arrest, all evidence derived from the resulting search warrant, all cellphone location and pen register information, and any evidence found on the cellular telephones found in his apartment. (ECF No. 599.) He also challenges the arrest warrant, claiming that the allegations in the complaint do not support probable cause. (Id.)

Notably, the conflict which created the need for an evidentiary hearing was between a statement in Sosunov's affidavit, in which he references being arrested outside his apartment, (id.), and the Government's brief of March 16, 2017, in which it states that Sosunov was arrested in the threshold of his apartment, (ECF No. 627, Mem. of Law of the United States of America in Opp. to Defs.' Mot. to Suppress Evidence ("Mem. Opp.") at 5). The Court finds Sosunov's statement unsupported by any credible evidence.

In support of his motion, Sosunov submitted an affidavit. He did not testify at the evidentiary hearing. In his affidavit, he stated:

> On October 27, 2017, FBI Agents arrested me pursuant to a Complaint/Arrest warrant. The Agents knocked on the door, I asked who is it, the agents said FBI, I opened the door, the Agents grabbed me, put me up against the wall outside of my apartment and put handcuffs on me. They then proceeded inside of my apartment without permission or authorization.

(ECF No. 601, Def.'s Aff. ¶ 4.) In his affidavit, Sosunov further stated that he "observed the agents pick up the envelopes and look through them. The Agent then scattered them around on the table and left them like that." (Id. ¶ 7.)

In response, while the Government did not submit its own affidavit, it argued in its motion papers that the agents "comport[ed] with the knock and announce rule" and that he was arrested "on the threshold of his apartment." (Mem. Opp. at 5, 9.)

Prior to the evidentiary hearing, the Court informed the parties that they should be prepared to develop a factual record with regards to the following questions: "1. Was the defendant handcuffed outside his dwelling, and did the

officers enter the dwelling thereafter?  2. Did the officers believe exigent circumstances (relating to safety, flight of the defendant, or destruction of evidence) existed and required entry?  3. Are there any facts supporting entry upon consent?" (ECF No. 639, Order.)

In Sosunov's reply memorandum, he added a new assertion that "while Sosunov was getting handcuffed, his wife, stood in the doorway and blocked the entryway.  Sosunov's wife asked whether the Agents had a search warrant, the Agents said that they didn't and proceeded to force their way past Mr. Sosunov's wife and into the subject apartment."  (ECF No. 647, Mem. of Law in Reply to the Government's Response in Opp. to Def. Emil Sosunov's Pretrial Mots. ("Reply Mem.") at 4.)  This statement is without any factual support whatsoever and the Court disregards it entirely.

## II.  LEGAL PRINCIPLES

### A.  Burden of Proof

The burdens of production and persuasion generally rest upon the movant in a suppression hearing.  United States v. Arboleda, 633 F.2d 985, 989 (2d Cir. 1980). "The movant can shift the burden of persuasion to the Government and require it to justify its search, however, when the search [is] conducted without a warrant."  Id. At a suppression hearing, the burden must be met by "no greater burden than proof by a preponderance of the evidence."  United States v. Matlock, 415 U.S. 164, 177 n.14 (1974).

B.  <u>Execution of Arrest Warrants, Protective Sweeps, and Plain View Evidence</u>

"Generally, the police do not need a search warrant to enter a suspect's home when they have an arrest warrant for the suspect."  <u>United States v. Lauter</u>, 57 F.3d 212, 214 (2d Cir. 1995) (citing <u>Payton v. New York</u>, 445 U.S. 573, 603 (1980)). Accordingly, "[a]gents may enter a suspect's residence, or what they have reason to believe is his residence, in order to effectuate an arrest warrant where a reasonable belief exists that the suspect is present."  <u>Lauter</u>, 57 F.3d at 214 (citations omitted).

Here, there is a dispute as to whether the officers were entitled to enter the apartment at all and, once they did, whether they were entitled to use the evidence they saw in plain sight to support probable cause for a search warrant.  Of course, embedded in these questions are factual issues relating to whether a protective sweep was appropriate, and whether the items alleged to have been in plain view were in fact in plain view.  <u>See, e.g.</u>, <u>Terry v. Ohio</u>, 392 U.S. 1, 28 (1968) ("The manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all.").

The Fourth Amendment protects persons against <u>unreasonable</u> searches and seizures.  U.S. Const. amend. IV (emphasis added).  "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."  <u>Union Pac. Ry. Co. v. Botsford</u>, 141 U.S. 250, 251 (1891).  "Ever since its inception, the rule excluding evidence seized in violation of the Fourth Amendment has been

15

recognized as a principal mode of discouraging lawless police conduct." Terry, 392 U.S. at 12.

Evidence seized in violation of the Fourth Amendment is subject to exclusion at trial. Id. at 13.[9] This has the advantage of insuring judicial integrity and protecting courts from being made a party to "lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasion." Id. at 13. Put in a more colloquial way, in the absence of a warrant or the applicability of an exception, law enforcement does not have a general right to enter one's home, rifle through drawers, and take what might be found therein. See, e.g., United States v. Jenkins, 876 F.2d 1085, 1088 (2d Cir. 1989.)

The Warrant Clause of the Fourth Amendment recognizes that judicial approval of seizures of the person do not run afoul of a person's constitutional right to be free from such restraint. U.S. Const. amend. IV ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."); see also Terry, 392 U.S. at 20; Katz v. United States, 389 U.S. 347, 354-57 (1967).

When police officers are validly present in a residence, such as in aid of executing an arrest warrant, facts and circumstances incident to that entry may

---

[9] The exclusionary rule is a "deterrent sanction," Davis v. United States, 564 U.S. 229, 231-32 (2011), and "encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and . . . 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016) (quoting Segura v. United States, 468 U.S. 796, 804 (1984)). Because the exclusionary rule is a "prudential" doctrine, see Davis, 564 U.S. at 236, it is "applicable only . . . where its deterrence benefits outweigh its substantial social costs," as "suppression of evidence . . . has always been our last resort, not our first impulse," Strieff, 136 S. Ct. at 2061 (quoting Hudson v. Michigan, 547 U.S. 586, 591 (2006)).

provide them with legal authority to ensure their own safety by performing a "protective sweep." See Maryland v. Buie, 494 U.S. 325, 334–36 (1990); Lauter, 57 F.3d at 216; see also United States v. Kiyuyung, 171 F.3d 78, 83 (2d Cir. 1999) ("Under the 'security check' exception, where law enforcement officers have lawfully entered premises in connection with an arrest, they are entitled to make a quick and limited 'security check' of the premises to be sure there are no persons or objects on the premises to pose a safety threat to the officers.")  A protective sweep is an "adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. . . . [A]n in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.'" Buie, 494 U.S. at 333.

In appropriate circumstances, a protective sweep does not constitute an unreasonable search in violation of the Fourth Amendment.  See, e.g., Terry, 392 U.S. at 9; Kiyuyung, 171 F.3d at 83; Lauter, 57 F.3d at 216.  Officers may perform a protective sweep where there are "specific and articulable facts warranting a reasonably prudent officer to believe that an individual posing a danger is lurking in an area to be swept." United States v. Hassock, 631 F.3d 79, 86 (2d Cir. 2011). In other words, officers are justified in

> taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack.  The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. . . . [T]he arresting officers are permitted . . . to take reasonable steps to ensure their safety after, and while making, the arrest.

Buie, 494 U.S. at 333-34.

Courts have held that a protective sweep validly encompasses closets and other spaces adjoining the place of arrest "from which an attack could be immediately launched." Buie, 494 U.S. at 334. If an officer has "articulable facts" that support an inference that an area to be swept harbors an individual posing a danger to those present, the officer may extend the scope of the sweep to other areas of the residence as well. Id. A protective sweep is not, however, authorization to conduct a full search of the premises; it may only extend to a "cursory inspection of those spaces where a person may be found." Id. at 335; see also United States v. Miller, 430 F.3d 93, 97 (2d Cir. 2005) (noting that a protective sweep "may not be unnecessarily invasive and may extend only to a cursory inspection of those spaces where a person may be found").

When law enforcement officers are engaged in otherwise lawful activities (such as the execution of a valid arrest warrant) and see illegal or evidentiary items in plain view, they may seize them without a warrant. United States v. Scopo, 19 F.3d 777, 782 (2d Cir. 1994); Kiyuyung, 171 F.3d at 83 ("Under the 'plain view' exception, 'if police are lawfully in a position from which they may see an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.'") (citing Minnesota v. Dickerson, 508 U.S. 366, 375 (1993)). "Patently incriminating evidence that is in plain view during a proper security check may be seized without a warrant." Kiyuyung, 171 F.3d at 83; see also Dickerson, 508 U.S. at 375-76. This is referred to as the "plain view" exception to the warrant requirement.

This exception has three elements: (1) the evidence must, in fact, be in plain view; (2) the officers who seize such evidence must not have violated the Fourth Amendment in arriving at the place in which the evidence is plainly viewed; and (3) the incriminating character of the evidence must be immediately apparent. See Horton v. California, 496 U.S. 128, 136-37 (1990); see also Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971); United States v. Delibac, 925 F.2d 610, 613 (2d Cir. 1991).

C.  Probable Cause for the Issuance of a Warrant

The Supreme Court's Fourth Amendment jurisprudence establishes that "probable-cause requirements before a warrant for either arrest or search can issue require that the judicial officer issuing such a warrant be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant." Whiteley v. Warden, 401 U.S. 560, 564 (1971).  "[A]n arrest warrant shall issue only upon a sworn complaint setting forth the essential facts constituting the offense charged, and showing that there is probable cause to believe that an offense has been committed and that the defendant has committed it." Wong Sun v. United States, 371 U.S. 471, 482 n.9 (1963) (internal quotations omitted).  Likewise, a search warrant must be supported by an affidavit that "set[s] forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." Franks v. Delaware, 438 U.S. 154, 165 (1978).  A search warrant is valid where it rests on a finding that probable cause exists to believe that a crime has been committed and evidence or

instrumentalities of the crime will be found in the place to be searched. United

States v. Travisano, 724 F.2d 341, 346 (2d Cir. 1983).[10]

In deciding whether to issue a warrant, magistrates apply a "totality-of-the-

circumstances analysis" to inform their probable cause determinations. In Illinois

v. Gates, 462 U.S. 213, 238 (1983), the Supreme Court stated:

> The task of the issuing magistrate is simply to make a practical,
> common-sense decision whether, given all the circumstances set forth
> in the affidavit before him, including the "veracity" and "basis of
> knowledge" of persons supplying hearsay information, there is a fair
> probability that contraband or evidence of a crime will be found in a
> particular place. And the duty of a reviewing court is simply to ensure
> that the magistrate had a "substantial basis for . . . conclud[ing]" that
> probable cause existed.

Id. (alterations in original) (quoting Jones v. United States, 362 U.S. 257, 271

(1960)). "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit

[applying for a warrant] should not take the form of de novo review," and "'courts

should not invalidate [a] warrant by interpreting the [supporting] affidavit in a

hypertechnical, rather than a commonsense, manner.'" United States v. Smith, 9

F.3d 1007, 1012 (2d Cir. 1993) (alterations in original) (quoting Jones, 362 U.S. at

270).

Even if some portion of the evidence described an affidavit is ruled to be

tainted in some way, the warrant may still be valid as long as the untainted

---

[10] Furthermore, an affidavit supporting a search warrant carries a "presumption of validity." Franks, 438 U.S. at 171. In certain circumstances, however, a defendant may "challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the resulting search." United States v. Martin, 426 F.3d 68, 73 (2d Cir. 2005). "One such circumstance is where the affidavit in support of the search warrant is alleged to contain deliberately or recklessly false or misleading information." United States v. Canfield, 212 F.3d 713, 717 (2d Cir. 2000).

portions support a finding of probable cause. United States v. Martin, 426 F.3d 68, 74 (2d Cir. 2005) (noting that, if some evidence was seized illegally, a reviewing court should consider whether the "untainted portions" of the affidavit support probable cause).

III.   DISCUSSION

Sosunov challenges each step taken by law enforcement on October 26 and 27, 2018.  First, he claims that the arrest warrant was not supported by probable cause.  As such, he argues, any evidence seen or seized by the officers (before or after a search warrant was obtained) should be excluded.  Even if the arrest warrant was valid, however, Sosunov argues that the agents improperly entered his home and that for this reason, any evidence seen in plain view officers (before or after a search warrant was obtained) should be excluded and should not have been used to support a search warrant application.  Finally, he asserts that even if law enforcement lawfully entered his home during his arrest, the subsequently issued search warrant was not supported by probable cause and thus any evidence seized pursuant to the search should be excluded.

A.   Validity of the Arrest Warrant

Sosunov first contends that the complaint did not support probable cause for an arrest warrant.  The existence of probable cause is determined by considering the totality of the circumstances; in other words, the Court must determine whether, as a whole, the complaint sets forth probable cause to believe that Sosunov was involved in a narcotics conspiracy.  See Gates, 462 U.S. at 238.

The complaint sets forth sufficient facts to support probable cause. It states that Sosunov met with two men (who were and are suspected of selling oxycodone prescriptions) in a car parked outside Dovlatyan's office, where Sosunov provided "what appeared to be a large amount of currency to Dovlatyn [sic]." (Compl. ¶ 11.) It further states that several hours later, Sosunov met another individual who went into a pharmacy where he had previously filled oxycodone prescriptions; when the other individual subsequently left the pharmacy, she handed him a bag. (Id. ¶ 12.)

Defendant's arguments are based upon a review of each fact in isolation—not, as the standard requires, the totality of the circumstances. Defendant suggests that there are innocent explanations for each event, such as the possibility that the bag contained over-the-counter Motrin. He also claims that the fact Dovlatyan was arrested and found in possession of $2100 three hours after meeting Sosunov does not, itself, support probable cause that Sosunov had engaged in criminal activity. But these facts are neither the whole story nor the crux of the complaint. The complaint need not demonstrate that Sosunov is guilty of criminal conduct beyond a reasonable doubt or that each of his actions, in isolation, suggests criminal activity. It need only set forth probable cause based on the totality of the circumstances. See Gates, 462 U.S. at 238.

Here, the complaint, taken as a whole, describes a pattern of activity that is most aptly described as narcotics trafficking. It alleges that: (1) over the preceding year and a half, Sosunov received prescriptions for thousands of oxycodone pills; (2) Sosunov met with a doctor known to participate in narcotics trafficking, where he

appeared to hand the doctor a large amount of cash; (3) Sosunov subsequently went to a pharmacy, where he met another individual who then went inside; and (4) when that individual came out, she handed Sosunov a bag.  Certainly, this rises to the level of probable cause for arrest.  As such, the arrest warrant was validly issued.

B.  Validity of the Search Warrant

As discussed above, probable cause can be established based on plain view evidence as long as the police were acting lawfully when they saw the evidence, the incriminating character of the evidence is immediately apparent, and, of course, the evidence is actually in plain view.  See Horton v. California, 496 U.S. 128, 136-37 (1990).  Because the protective sweep of Sosunov's apartment was performed lawfully, the evidence seen in plain view may be used to establish probable cause for a search warrant.

Defendant challenges the use of five pieces of evidence observed in the apartment: (1) the two bottles of oxycodone bearing Dovlatyan's names; (2) an unmarked prescription pill bottle with unidentified pills next to the two oxycodone bottles; (3) the envelopes found adjacent to the balcony door, each of which bore names, amounts, and colors; (4) a locked safe in a hallway closet; and (5) three separate cellphones.  He challenges this evidence on three grounds: (1) the agents were not lawfully present in the apartment; (2) the agents manipulated some of the evidence (the envelopes) and thus it was not truly in "plain view"; and (3) that

neither the safe nor the cellphones are indicative of possible criminal activity and do not support probable cause for a search warrant.

       1. <u>Validity of the Protective Sweep</u>

Upon execution of the arrest warrant, the agents appropriately entered Sosunov's apartment and performed a protective sweep. During that sweep, they observed each of the challenged items in plain view. These findings are based on the following facts.

The parties agree that the agents knocked and announced themselves and that Sosunov answered the door within one minute (i.e., the agents waited longer than is constitutionally required, <u>see</u> <u>United States v. Banks</u>, 540 U.S. 31 (2003)). Because Sosunov was in his underwear, the agents eventually took him to his bedroom—in the back of the apartment—to get dressed before taking him to be booked and presented to a magistrate judge. The evidence at the suppression hearing established: (1) that the defendant was handcuffed in the doorway of his apartment; (2) that the agents saw a potential person whom they believed could herself have had a drug arrest history inside the apartment; (3) that they knew the defendant had been previously arrested on weapons charges; and (4) that a suspect in the same case had previously escaped arrest by jumping from a second-story window. All of this information was properly considered and informed the officers' states of mind as to the need for the sweep in the first instance.

The officers did not arrest Sosunov outside his apartment; accordingly, they did not violate his Fourth Amendment rights when they performed a protective

sweep to ensure their safety in the apartment. Hearing testimony established that Hanratty and the other officers were concerned about Sosunov's prior arrests for felony assault and dangerous drug arrests as well as Gendelman's dangerous drug arrest; these prior arrests indicated to the experienced agents that either Sosunov or Gendelman could pose a threat. Hanratty also explained that in a previous arrest in the same case, someone had jumped from a second-story window and escaped.

Certainly, these are "specific and articulable facts warranting a reasonably prudent officer" to perform a protective sweep. Hassock, 631 F.3d at 86. The officers were entitled to perform a short "security check." Kiyuyung, 171 F.3d at 83 (2d Cir. 1999). In arguing that the officers were unlawfully present, Sosunov initially asserted that he opened the door and was handcuffed against a wall in the hallway outside his apartment. (Def.'s Aff. ¶ 4.)[11] His reply memorandum adds an assertion that while this was occurring, his wife "stood in the doorway and blocked the entryway." (Reply Mem. at 4.) The brief states that his wife asked the agents if they had a warrant, and they replied that they did not and "proceeded to force their way past Mr. Sosunov's wife and into the subject apartment." (Id. at 4.)

Simply put, the Court credits the testimony of three separate law enforcement agents over the defendant's affidavit and briefs. Leaving aside the

---

[11] The Court notes that this affidavit, submitted with his motion, provides a different account than his opening brief in support of his motion, which states that Sosunov's wife answered the door and that agents forced their way past her into the apartment. (ECF No. 602, Mem. of Law in Supp. of Def. Emil Sosunovs Pretrial Mots. ("Mem. Supp.") at 12-13.) Because his reply memorandum offers a "correction" to the original memorandum and states that the affidavit is correct, the Court relies on the affidavit and reply memorandum for this particular question. (Reply Mem at 3-4.)

possibility that Sosunov's story may have changed throughout the briefing of this motion, the Court finds that Sosunov was in the doorway when he was handcuffed and that his wife was at least six to ten feet away from the door. When asked why he performed the sweep, Hanratty testified that he had heard multiple people talking while they waited for Sosunov to open the door, and that, because "there is a lot of dead space in there on that whole side of the living room," he needed to ensure that Gendelman was not able to reach "a gun or reaching for anything for our safety in there. It was a very tight hallway with a lot of bodies in there. We are we were in like a fatal funnel in that area. My responsibility as the team leader is to ensure the safety of everybody involved." Accordingly, there is ample support for a finding that the agents were lawfully in Sosunov's apartment when they performed the protective sweep. The evidence seen in plain view was thus properly used in the affidavit supporting the search warrant application.[12]

### 2. The Manipulation of the Envelopes

The evidence makes clear that at some point between the agents' entry into the apartment and the application for a search warrant, the agents did handle the envelopes adjacent to the balcony door. However, the preponderance of the evidence supports that prior to any manipulation, sufficient evidence was observed to indicate that the envelopes related to drug transactions. Several photographs of the envelopes were introduced into evidence, including one before the envelopes were

---

[12] At the suppression hearing, defense counsel noted that the Turpin Affidavit referred to "prescriptions," when in fact Turpin had seen prescription pill bottles. (Tr. at 62:2-63:23.) Turpin testified that his reference to "oxycodone prescriptions" in the affidavit in fact referred to "the prescriptions as filled in the bottle." (Id. at 20-22.)

moved and one after they were moved. (See, e.g., GX 105, 103D, 103B.) GX 105 represents the arrangement of the envelopes before they were touched. In that photo, one can plainly see that the envelopes on the top of the pile have the writing referred to in the Turpin Affidavit (i.e., names, numbers, and at least one color ("orange")). Accordingly, this directly contradicts Sosunov's argument that "[t]here is no way the Agent could have seen 'writing on the face of each envelope' without manipulating and/or moving the envelopes." (Mem. Supp. at 14.) Turpin also testified that the names on the envelopes in plain view were significant because he recognized them from other aspects of the investigation—namely, BNE records with which he had spent "days doing background checks confirming are these real people . . . [and] search[ing] for high amounts of oxy." (Tr. at 25:1-27:4.) While it is true that the agents could not have seen the writing on every envelope, it is clear that the writing on some envelopes was in plain view before the envelopes were handled by any agent. Accordingly, the envelopes were properly used to support probable cause for the search warrant.

        3.  The Safe and Three Cellphones

Finally, Sosunov maintains that the safe and three cellphones are not "instrumentalities, fruits and evidence" of a narcotics conspiracy and thus are not supportive of probable cause. Turpin's affidavit did not include any allegations connecting the safe to a crime, and it did not state that the cellphones were used to commit any crimes. He further claims that the fact of three phones (in an apartment with two residents) cannot support probable cause to believe they have

27

been used in connection with a crime. This all may be true, but defendant ignores the crucial fact that Thomas had given law enforcement a cellphone number for Sosunov, leading the agents to believe that Sosunov had used this number to communicate with Thomas in furtherance of the narcotics conspiracy. Additionally, the agents knew that a "common tactic for their operation was using multiple phones," (Tr. at 21:14-23), and that "we knew [Sosunov] to use cell phones to conduct the pill scheme," (id. at 52:22-23).

Moreover, even without the cellphones and safe, the search warrant is supported by probable cause. Taking into account what the officers believed at the time of the search, the envelopes and pill bottles fit into the suspected narcotics conspiracy scheme and supported probable cause on their own. So even assuming that the cellphones and safes were not plain view evidence because their criminal nature was not immediately apparent, the complaint establishes probable cause on the basis of the remaining evidence (i.e., the prescription pill bottles and the envelopes). See Martin, 426 F.3d at 74. Accordingly, even if the Court were to ignore these two pieces of evidence, the "corrected affidavit supports probable cause" and "suppression is inappropriate." Id. at 73.

\*       \*       \*

Accordingly, the Court finds that none of Sosunov's arguments present grounds to suppress any evidence obtained during the protective sweep or during execution of the search warrant.

C. <u>Validity of the Geolocation Data Warrant</u>

Sosunov also claims that the affidavit in support of the application for a warrant for his geolocation information lacked sufficient allegations to support probable cause. However, the affidavit rested on facts largely identical to those in the Complaint. As discussed earlier, those facts support probable cause. Additionally, the affidavit added allegations that tied the defendant to the particular cellphone number identified in the warrant and order, including that Sosunov had texted Thomas in advance of the October 27, 2017 meeting from that number. (ECF No. 600-3, Agent Aff. in Supp of Warrant & Order for Cellphone Location and Pen Register Information ¶ 20.) Accordingly, the affidavit sets forth ample facts supporting probable cause and there is no reason to suppress any evidence gathered using the warrant.[13]

IV. CONCLUSION

For the reasons stated, the motion to suppress is DENIED. The Clerk of Court is directed to close the open motion at ECF No. 599.

SO ORDERED.

Dated:  New York, New York
        May 7, 2018

                                          _____
                                          KATHERINE B. FORREST
                                          United States District Judge

---

[13] Defendant also raises an argument that the fruits of a search of the cellphones seized in his apartment should be suppressed. (Mem. Supp. at 3.) The Government has not obtained a warrant for this type of search and has not searched the cellphones. (Mem. Opp. at 12.) Any argument that the cellphones were illegally seized fails for the reasons set forth above.